IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XUEYONG WU,<br><br>a.k.a. "ANTONIO"<br><br>Defendant. | Case No. 1:19-mj-527 (TCB)<br><br>**UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. The following affidavit is made in support of a criminal complaint and physical arrest of Xueyong WU (a.k.a. "Antonio") for violations of 21 U.S.C. 846 and 18 U.S.C. 1956(h). The information contained in this affidavit is based upon information obtained by the Affiant as well as information provided by other law enforcement officers. The information in this affidavit is provided to establish probable cause and does not contain every fact established during this investigation.

2. I am an Officer of the U.S. Drug Enforcement Administration (DEA) who is designated by the Attorney General to enforce the Controlled Substances Act. 21 U.S.C. § 878. I am also an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 878 of Title 21, United States Code.

3. I am a Special Agent with the United States Drug Enforcement Administration (DEA) and have been so employed since January of 2005. I am currently assigned to DEA's Special Operations Division. As a DEA Special Agent, I have conducted numerous investigations targeting high-level foreign drug traffickers and money launderers based in Central and South America.

4. During my career as a Special Agent of the DEA, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics investigations, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to seizures of narcotics, firearms, and other contraband.

5. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities. From my experience and training, I have learned, among other things, that: (a) drug traffickers virtually never explicitly refer to drugs by name, instead,

to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they use coded language to discuss drug trafficking; (b) narcotics traffickers and money launderers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers and money launderers frequently use cellular telephones as well as text messaging features of their cellular telephones to communicate and further conceal their communications from law enforcement.

6. Through the course of investigations and based on my training, experience, and communicating with other investigators, I am familiar with the manner in which drug traffickers utilize money launderers to transport and transfer proceeds from the sale of narcotics. More specifically, I know that Mexican cartels arrange to transport narcotics across the U.S.-Mexico border, where the drugs are distributed and sold in the United States. The sale of the narcotics generates drug proceeds. Many Mexican cartels utilize money laundering organizations and money brokers who arrange to pickup the drug proceeds in the United States and to transfer the value of the drug proceeds from the United States to Mexico. I know that this transfer can be done through a variety of methods, including bulk cash smuggling or trade based money laundering. In trade-based money laundering, the drug proceeds are used to purchase goods, and the goods are then transported either to Mexico or some intermediate country, and sold. If sold in Mexico, the sales generate Mexican Pesos, which are then utilized to pay off the Mexican drug traffickers. If the goods are shipped to a third country, such as China, their sale generates

Chinese currency, which can be used to pay for Chinese goods that can be shipped for sale in Mexico. Such sales also generate Pesos, which can be used to pay off the Mexican drug traffickers.

7. Since approximately January of 2017, the DEA, assisted by the United States Department of Homeland Security (DHS) – Homeland Security Investigations (HSI) and the U.S. Diplomatic Security Service (DSS), has investigated an international cocaine trafficking and money laundering organization responsible for trafficking large quantities of cocaine from Colombia to Central America and Mexico for importation into the United States.

8. In so doing, investigators discovered Xizhi LI, a Chinese national residing in Mexico, is one of the leaders of this global money laundering and cocaine smuggling group. This investigation has shown that he is aided by domestic and foreign money launderers, including Xueyong WU (a.k.a. "Antonio").

9. In addition to trade-based and bulk currency smuggling operations, LI, and his co-conspirators have laundered drug money through domestic real estate ventures (including mortgages and loans on these properties) and mirror transfers. LI's money laundering network operates throughout the United States, including within the Eastern District of Virginia.

10. Law enforcement has determined LI, WU, and others conspired to launder drug proceeds generated in the United States to foreign locations, and operated a casino in Guatemala to facilitate money laundering and drug trafficking activities.

11. Throughout this investigation, law enforcement has investigated numerous individuals involved in this organization's illegal activities. Law enforcement has

discovered they possess and use telephonic devices to facilitate their criminal activity (including those directly associated with WU), and often use end-to-end encrypted applications to protect their communications from interception by law enforcement.

12. During this investigation, law enforcement identified a money launderer who worked on behalf of LI's organization. That individual, hereafter referred to as co-conspirator (CC-1),[1] was arrested in July of 2017 and pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. 1956(h). CC-1 is currently serving a 120-month term of imprisonment.[2]

13. According to CC-1, he and LI met in 2008 and were associated until CC-1's arrest in 2017. CC-1 was privy to details about LI's criminal activities including, but not limited to, drug trafficking, and money laundering. According to CC-1, although LI engaged in the direct importation and distribution of drugs, LI's primary illegal activities involved laundering drug money on behalf of Latin American TCOs. In this, CC-1 relayed that LI was aided by Xueyong WU. CC-1's knowledge came from his direct involvement in this criminal scheme, in which he independently organized financial

---

[1] CC-1, CC-2, and CS-3 will be referred to in the masculine regardless of their actual gender.

[2] As part of that plea, CC-1 agreed to cooperate with law enforcement in return for anticipated sentencing consideration, and for more than two years, CC-1 has provided and continues to provide information to law enforcement. At sentencing, CC-1 received no benefit for CC-1's cooperation but CC-1 may qualify for a reduction in sentence, pursuant to a motion from the government filed under Rule 35. CC-1 had a romantic and professional relationship with LI. CC-1's information has been corroborated by information provided by multiple additional cooperating co-conspirators, bank records, naturalization documents of LI, and electronic communications, among other means. CC-1 has also agreed to testify at any jury trials if requested to do so by the government. CC-1 has no prior criminal history but has engaged in most of the same activities as LI, including money laundering and human smuggling. Among the individuals CC-1 discussed was LI and WU.

5

transactions involving the proceeds of drug sales on behalf of Mexican drug-trafficking organizations (DTOs), and CC-1 also worked directly with LI and engaged in money laundering activity on behalf of LI's organization.

14. Among his activities, CC-1 arranged the collection and movement of drug proceeds for LI through bank accounts, as reflected in electronic communications obtained from one of CC-1's cellular telephones.[3] CC-1 also stated that LI owned a series of businesses he used to launder drug proceeds and that he purchased real estate with drug proceeds. CC-1 disclosed that LI previously owned a casino in Guatemala, later identified as the Golden MGM casino (now closed). According to CC-1, LI worked with two other individuals to manage this casino: Xueyong WU and an individual hereafter identified as CC-2. CC-1 identified WU from a passport photograph. According to CC-1, WU also used the alias "Antonio."

15. CC-1 explained that Xizhi LI and CC-2 began working together to facilitate international drug trafficking and money laundering at the Guatemalan casino named "GOLDEN VIDEO LOTERIA" (a.k.a. "VIDEOLOTERIA GOLDEN"). CC-1 confirmed this casino was in Guatemala City, Guatemala.

16. CC-1 explained the purpose of the casino was for LI, WU, and others to show drug cartel representatives that they (LI, Xueyong WU, and others) were wealthy businessmen. According to CC-1, this was important because it showed the drug traffickers that WU and LI were capable of successfully moving drug money, and that if the money was seized, they would be capable of repaying the DTOs. Additionally, CC-1 said LI and his organization owned/operated the casino to make new drug trafficking and

money laundering contacts.. CC-1 also added that LI, WU, and others met cartel clients at the casino, and that LI possessed weapons in the casino.

17.     CC-1 noted WU and CC-2 rented the casino from LI for approximately $10,000 (USD) per month. CC-1 said WU paid his rent by making monthly deposits into an account held by LI.

18.     Law enforcement's analysis of CC-1's cellular telephones showed that CC-1 was an active user of "WeChat," a Hong Kong-based encrypted messaging application, which I know from my training and experience, is commonly used by Chinese drug traffickers and money launderers due to its heightened security and encryption. Within the application downloaded to CC-1's phones, investigators located a series of communications involving the coordination of money laundering activities in the United States and elsewhere. Notably, in several communications between CC-1 and his co-conspirators, CC-1 received and then provided WU's name and bank account information, as outlined in the following communications:

**2017-07-19 23:46:47 PM UTC-04:00:**

| "CH" a.k.a. Chuxian | 6228410614505862378, Agricultural Bank, Enping City Sub-branch. Wu, Xueyong |
|---|---|

**2017-07-19 23:48:19 PM UTC-04:00:**

| "HL" | 6228410614505862378, Agricultural Bank, Enping City Sub-branch. Wu, |
|---|---|

---

[3] CC-1 had five telephones in his possession at the time of arrest, which contained numerous money laundering communications between CC-1 and LI.

| a.k.a. Hui Long | Xueyong. |
|---|---|

19. Based on my knowledge of this investigation, in the two communications, described above, which took place on or about July 19, 2017, I believe CC-1 communicated about sending drug proceeds designed to be remitted to China as part of the aforementioned scheme. Furthermore, I believe the financial accounts referenced in these two communications belonged to WU and were used to launder proceeds derived from the illegal sale of controlled substances, including cocaine, in the United States.

20. Additionally, throughout 2019, law enforcement debriefed a confidential source (hereafter, CS-1) who provided extensive information about this conspiracy. CS-1 has been a cooperating source with DEA since 2017.[4]

21. In response to questioning about CC-2 and WU's use of a casino, CS-1 told investigators that the Colombians (referring to Colombia-based criminal associates) would trust CC-2 more if he owned a casino. CS-1 added that CC-2 was involved in the casino business to attract drug traffickers, and his involvement in this business had the desired effect. CS-1 also explained that the casino served as collateral for the drug

---

[4] CS-1 made a large number of money pick-ups throughout the United States on behalf of CC-2, thereby assisting in laundering at least $30,000,000 in drug proceeds. In approximately 2017, CS-1 was arrested with a large amount of U.S. currency during a vehicle stop. CS-1 has not been charged with any crime. CS-1 has been paid for his work as a source. The information CS-1 has provided to law enforcement has been deemed accurate and reliable, and has been further corroborated through independent means, including ledgers and EZ pass vehicle records. For these reasons, I consider CS-1 to be reliable.

traffickers with whom CC-2 was doing business, as the traffickers would get the impression that CC-2 and his associates, including WU, were making money.

22. CS-1 said CC-2 had a partner in the casino named "Antonio." CS-1 positively identified a photograph of WU as the individual he knew as "Antonio".

23. CS-1 admitted that he met WU in both Brooklyn, New York, and in California. CS-1 admitted that he delivered money to "Antonio" in Brooklyn, New York. CS-1 also said that WU received a percentage (or commission) of the money pick-ups that CS-1 conducted on behalf of CC-2. According to CS-1, CC-2 said that if he (CC-2) was not around, that CS-1 should deal with "Antonio." Law enforcement corroborated WU's travel to both New York and California through flight records. These records confirmed that WU traveled to both locations during the same general period when CS-1 claimed he met with WU to conduct money-laundering transactions.

24. Sometime in and around 2016, CS-1 also transported approximately 10 kilograms of cocaine from Los Angeles and ultimately to New York City. CS-1 transported the cocaine through the Eastern District of Virginia along I-95. CS-1 also transported bulk currency (typically $300,000 or more) approximately 100 times on behalf of the conspiracy. CS-1 transited the Eastern District of Virginia, again along I-95, to deliver and obtain these proceeds. CS-1 stated that he believed the funds were drug proceeds because on at least one occasion, the money smelled like cocaine. Other circumstances of the money pickups led CS-1 to conclude that the funds were derived from drug sales, including the fact that the individuals from whom he was obtaining the cash possessed weapons, and that the exchanges took place under clandestine circumstances, such as in motel rooms.

25. On December 9, 2019, the Honorable Jean P. Rosenbluth, U.S. Magistrate Judge for the Central District of California, authorized the search and seizure of Xueyong WU's belongings, digital devices, and other articles. On December 11, 2019, WU entered the United States through the Los Angeles International Airport aboard China Southern Airlines flight # CZ621. WU was placed into secondary examination by U.S. Customs and Border Protection. There, DEA Special Agents served WU with a copy of the warrant for his electronic devices.

26. WU possessed, among other things, four electronic devices. WU provided law enforcement with the passcodes to his devices. Law enforcement began to search through the devices, and found numerous electronic communications between WU and other individuals discussing the movement and transfer of bulk currency, and discovered photographs of large quantities of bulk United States Currency.

27. In addition, investigators interviewed WU at the Los Angeles International Airport. WU admitted knowing and having met Xizhi LI, and said LI was CC-2's boss at the casino in Guatemala City. WU also admitted traveling to New York and California with CC-2 during 2016—the same locations and general times when CS-1 claimed that he met with WU as part of his money laundering activities. WU also admitted that he was a part owner in the casino owned and operated by LI and CC-2. Eventually, WU requested to speak to an attorney at which point the interview ceased. Based on the foregoing facts, law enforcement arrested WU based on probable cause for his involvement in a conspiracy to distribute five kilograms or more of cocaine (21 U.S.C. § 846) and conspiracy to commit money laundering (18 U.S.C. § 1956(h)).

28. Based on the foregoing evidence, I respectfully submit that probable cause exists showing Xueyong WU conspired to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. 846 and conspired to commit money laundering, in violation of 18 U.S.C. 1956(h).

                                                Tetyana X. Renelt, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me, this \_\_\_\_\_ day of _____, 2019.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa C. Buchanan
United States Magistrate Judge
Eastern District of Virginia